UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| DEBORAH SHORTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-00090 |
| | ) |
| MAGNETI MARELLI OF | ) |
| TENNESSEE, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This discrimination case is before the Court on Magneti Marelli of Tennessee LLC's ("Magneti") Motion for Summary Judgment (Doc. No. 26). In her Complaint, Deborah Shorter ("Shorter") brought claims for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (Count I), and for race discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Count II). However, in her Response to the Motion for Summary Judgment, Shorter concedes that "the evidence is insufficient to sustain a claim based upon age discrimination," (Doc. No. 34 at 18), leaving only the question of whether Shorter has presented sufficient evidence from which a jury could conclude that she was subjected to intentional discrimination based on her race. After thoroughly reviewing the record and considering all of the arguments raised by the parties, the Court finds that there is not, and, therefore, will grant summary judgment in favor of Magneti.

### I. Factual Background

As a preliminary matter, the Court notes that, in accordance with Local Rules 56.01(b), Magneti filed a Statement of Undisputed Material Facts, to which Shorter responded. (Doc. Nos.

27, 36). However, in contravention of that same rule, Shorter incorporated into her response brief a "Statement of Additional Material Facts," instead of filing it as a separate document or as a part of her response to Magneti's statement of undisputed facts so that Magneti could respond. Nevertheless, the Court has considered Shorter's "additional facts." Further, because the exact basis for Shorter's race discrimination claim is not readily apparent from those filings, the Court has read Shorter's deposition (Doc. No. 26-1) in its entirety. Based upon all of those filings, the facts, construed in Shorter's favor, are as follows:[1]

Magneti is an auto parts manufacturer. It has a large plant located in Pulaski, Tennessee that employed approximately 2,000 people when Shorter worked there.

Magneti has written employment policies that require employees to report harassment to their immediate supervisor, the human resources department, or a member of management. Employees can also report problems through a toll-free hotline. Copies of these policies are given to all new employees, and they are trained on the meaning of the policies and how to identify and report harassment as part of the employee on-boarding process.

Shorter, a black female, began working at Magneti as a temporary employee in July 2015. At the time of her hiring, she went through the new hire orientation process, and was given a copy of Magneti's handbook, which included the policies forbidding harassment and discrimination based on race, age, and other legally protected characteristics. Shorter understood Magneti's anti-discrimination and anti-harassment policies. (Doc. No. 26-1, Shorter Dep. at 119).

After completing a 90-day probation period, Shorter was hired as a full-time, permanent

---

[1] In its filings, Magneti references some additional incidents where it claims Shorter was disruptive in the workplace. The Court does not include those incidents to the extent that they were not the subject of questioning during Shorter's deposition, or set forth in Magneti's Statement of Undisputed Facts.

employee. She worked in "Repack" (a part of the warehouse department) where she was responsible for taking parts from the warehouse and getting them to the manufacturing line.

Shorter's direct supervisor throughout her employment at Magneti was John Gronewold. He, in turn, reported to Anthony Roberts, who was the warehouse department head. Both Gronewold and Roberts are white males, as is Kurt Dimitrov, who was the Human Resources Manager at the time. (Doc. No. 36, Statement of Fact, at 3).

In October 2015, Shorter was appointed to the position of Interim Team Lead. (Shorter Dep. at 117-118). As the Interim Team Lead, she was responsible for ensuring parts got to the line, and the workers did their jobs. Shorter performed well in this position.

In late November or early December 2015, Tamaiya Vincent, a black female, became the Team Lead. (Id. at 117). The team leader role is not a supervisory position, and a team leader has no authority to hire, fire, or discipline employees.

For whatever reason, Shorter and Vincent did not get along. In fact, according to Shorter, when Vincent was appointed Team Lead, Vincent told others that Shorter would "have to go," even before the two spoke. (Id. at 70). Shorter thought that Vincent might be angry with her because an employee once asked Shorter for advice instead of Vincent, or because Vincent once told her that Shorter reminded her of her mother, who Vincent did not like. (Id. at 114). Shorter also allegedly heard Vincent tell a group of co-workers "don't pay that old woman [Shorter] no attention." (Id. at 137). Shorter did not report Vincent's comments to anyone at Magneti, or otherwise complain that the comments were discriminatory.

According to Magneti, Shorter told Dimitrov that she resented working with Vincent because Vincent is a homosexual. (Doc. No. 36 at 4). Shorter denies this, but admits that she did not want

3

to work with Vincent because Shorter "feared for her safety," (id.), and Vincent was a "bully," (Shorter Dep. at 90).

In her deposition, Shorter described Vincent as "com[ing] in rough most of the time," and characterized her as being "violent all the time." (Shorter Dep. at 72-73). Specifically, Vincent threatened to bring "her boys" to the plant to "blow this place up." (Id. at 73). Shorter believed "the boys" was a reference to gang members because of the way that Vincent "was carrying herself." (Id. at 73-74). Shorter admits, however, that she never saw Vincent engage in any violent acts, nor was Shorter subjected to threats by Vincent. Indeed, the only other "violent act" Shorter can recall is that Vincent said on several occasion that she "wasn't going take nothing off nobody."[2]

Apart from her problems with Vincent, Shorter had no issues with Gronewold, her direct supervisor, but she did have issues with Roberts, the department head. According to Shorter, Roberts did not want to do his job, and "wanted to make sure that he let you know that you was nothing," especially the black employees. (Id. at 37). Shorter has identified a couple of examples of Roberts' alleged mistreatment of black employees.

One example had to do with steel-toed shoes that were supplied and paid for by Magneti. At some point during her employment, employees were provided such shoes from a vendor, but many employees, including Shorter, complained that the shoes hurt their feet. In fact, Shorter claims that the shoes "burnt" her feet, such that she could barely stand. (Id. at 41). It is unclear whether

---

[2] Shorter also claims there were "drug problems" and "murderers working on the line" at Magneti. (Id. at 73). As for "murderers," Shorter heard a rumor that an employee working on the line had previously been convicted of murder. As for "drug problems," Shorter testified that "people were falling out" on the line, and there were "needles and things" both inside and outside the plant. However, Shorter concedes she has no first-hand knowledge that those who "fell out" did so as a result of drug use, and she did not report the "needles and things" to management because "everybody knew it." (Id. at 77-81).

4

Shorter complained to Roberts about the shoes, however. At one point during her deposition, Shorter testified that "he said, do the job, or go home," with the "he" presumably being a reference to Roberts because Roberts and the steel-toed shoes were the topic of the discussion at that point in the deposition. (Id.). Later, however, Shorter specifically testified that Roberts did not talk to her about the shoes, and she did not complain to him about the shoes, although she claims Roberts knew her "feet was hurting." (Id. at 41, 47). Regardless, Shorter called Magneti's hotline, and complained to Safety Manager, Ben Britton, a white male. The problem was solved when a new vendor was called in to provide steel-toed shoes.[3]

A second example involved employees using cell phones on the plant floor. According to Shorter, cell phones were supposed to be left in the employee's locker, but white employees regularly brought their phones to the floor and would leave the production line to take or make phone calls. Shorter identified three employees who allegedly did this – "Lisa" and "May," both white, and "Tracey", who was of mixed-race. Shorter contends Roberts knew white employees were using their cell phones in the work area because other employees came to her and told her they had informed Roberts about the phone use. Shorter also claims that, at some point, she discussed this with Roberts, and he suggested that, because there was always "something going on" in Repack, Shorter should move and work in the "Supermarket," which is another section in the warehouse department that performs tasks different from those in Repack. (Id. at 178).

---

[3] In response to Magneti's Statement of Undisputed Facts, Shorter relies on this incident as evidencing discriminatory bias by Roberts because a "black employee named Kendrick Rivers complained of the shoes to Mr. Roberts and was fired for doing so." (Doc. No. 36 at 2). However, as made clear in Shorter's deposition, she has no first-hand knowledge of the circumstances surrounding Rivers' termination. All she knows is that he was fired around the time employees were complaining about the steel-toed shoes. (Id. at 44-45).

A third example involved "Ben," a white employee, allegedly being allowed to "sleep off a drunk" in the Repack section. However, Shorter does not know if the employee was actually drunk, only that she was told he was. After the employee sat in her section for a while, he was retrieved by Gronewold and Roberts, and taken back to the warehouse. (Id. at 118-19).

A final example occurred when Shorter was Interim Team Lead, her line made quota, and Gronewold ordered pizza as a reward. According to Shorter, Tonya Dirkus, a white female, "came at her," and began screaming about them getting pizza. Shorter says she complained to Roberts, who did nothing, requiring her to complain to Dimitrov, who spoke to Dirkus. Dirkus eventually apologized. (Id. at 125-129).

In addition to complaining to Dimitrov about the Dirkus incident, Shorter claims to have gone to him on several other occasions during her employment at Magneti, including the following:

(1) On one occasion she and Sherry Holt, a white female, went to Dimitrov to talk about the "disarray" in the warehouse, and Roberts allowing it to be that way. This discussion had noting to do with alleged discrimination.

(2) On a couple of occasions, Shorter spoke with Dimitrov about the improper cell phone use, and white employees (primarily temporary employees) walking off the job for 30 minutes to an hour without repercussion.

(3) On one occasion, Shorter complained to Dimitrov that Vincent would "c[o]me at you violent," and that she was a "bully."

(4) On another occasion, Shorter complained to Dimitrov about nude pictures "Tracey" had taken of herself, which she then tried to show Shorter. (Id. at 92-93).

(Id. at 92-93, 122).

Shorter's last day of employment at Magneti was January 10, 2016. Shorter points to two events as precipitating her departure from the plant, although the sequence of events is not entirely clear.

When Shorter arrived at the facility that day, Vincent was not there and, as a result, materials were not being moved to the line for production. This prompted a supervisor from a production line to come to the Repack area and ask Shorter for help in getting parts so that he could get his line moving. Shorter refused because she was not the Team Lead, and told the supervisor he would have to await Vincent's arrival. A few minutes later, the supervisor returned and again asked for help getting his line going. This time, Shorter agreed. As she was walking with the supervisor towards the parts area, Vincent arrived angry, "hollering" that she was "not taking nothing today." (Id. at 57, 118).

Shorter also testified that, upon arriving at work that same morning, she discovered a temporary employee assigned to her team had hung some "Bible verses" at her workstation.[4] Shorter claims the Bible verses were "bad" and/or "Satanic" but cannot recall what they said specifically. Shorter reported the Bible verses to Vincent, who promptly tore them down. (Id. at 96-97).

At some point that same morning, Vincent went to Roberts and the two talked. Shorter does not know what was said, but believes that Vincent was trying to get her in trouble. After Roberts and Vincent spoke, Roberts approached Shorter and asked her to go work in the Supermarket. (Id. at 57-58, 67). Whether this was to be a permanent or temporary move is in dispute. In her deposition, Shorter stated she believed this to be a permanent move, but in notes taken

---

[4] At another point, Shorter testified that the "Bible verse" incident occurred on January 6, 2016, some four days earlier. (Id. at 98). The difference in the dates has no bearing on the outcome of this case.

7

contemporaneously with the events, Shorter wrote that Roberts said, "Ms. Deborah, you have to go to Supermarket today." (Id. at 59, 207, Exh. 3). Magneti contends the move to the Supermarket was just for the day. Regardless, Shorter refused to go, insisting that she wanted to talk to Dimitrov first. (Id. at 59, 83).[5]

Both Roberts and Shorter tried to call Dimitrov, but could not reach him. Roberts then called the Human Resources office and was told that, because Shorter refused to go work in the Supermarket, she should be sent home for the day. (Id. at 59-60). Meanwhile, Shorter called 911 because there "was a lot of issues back there [in Repack] that need[ed] to be corrected." (Id. 61).

Roberts told Shorter that Human Resources said she needed to "go home." (Id.¶¶ 60, 113). Although Shorter was "floored" by the suggestion, she collected her things and went outside to meet the police. (Id. at 61).

The Giles County Sheriff's Department dispatched two squad cars to the plant. After officers discussed the situation with Shorter (and maybe others), they found that what Shorter "was reporting did not fit the criteria of harassment." (Id. at 199, Ex. 2). The officers then left the scene, as did Shorter.

Over the next two days, Shorter claims she tried to call Human Resources in accordance with the "rule book," and Magneti's "no call, no show" policy. (Id. at 62, 147). Although her testimony on this score is a bit inconsistent, Shorter claims that she not only called Human Resources, but also went to the plant in an effort to speak to Dimitrov, but was told he was in a meeting. Shorter claims she left a message for Dimitrov to call her, but he never did. For his part, Dimitrov testified in his

---

[5] Shorter believed that moving to the Supermarket would be a demotion because she would have to learn "new parts." She admits, however, that such a transfer, even if permanent, would not result in less hours, lower wages or a different shift. (Id. at 82-83).

8

deposition that he was unaware of Shorter ever attempting to come back to work, and he believed Shorter had simply quit. (Doc. No. 25-2 Dimitrov Dep. at 48). Regardless, even though Shorter had Dimitrov's cell phone number, she did not try to reach him on his cell phone after she left the plant on January 10, 2016. (Shorter Dep. at 148).

Shorter never returned to work at Magneti. Magneti claims that her position was never filled due to downsizing[6] and Shorter offers nothing to suggest otherwise.

## II. Standard of Review

As this Court has observed on several occasions in the past, [t]he standards governing summary judgment have been restated on countless occasions and are well known." See, e.g., Kryder v. Estate of Rogers, 296 F. Supp. 3d 892, 900 (M.D. Tenn. 2017). Put simply: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

## III. Legal Discussion

The analytical framework for deciding employment discrimination claims is also well known.

---

[6] Magnetti claims that Shorter's failure to report to work for three consecutive scheduled shifts constituted a resignation of employment as set forth at page 44 of the employee handbook. That may be true, but the copy of the handbook Magneti submitted as an attachment to the Declaration of Laila Rosa (Doc. No. 28) jumps from page 40 to page 50, and does not contain page 44.

9

In the absence of direct evidence (and there is none here), a plaintiff can survive summary judgment by establishing discrimination through indirect of circumstantial evidence under the burden shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as refined by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). "Under this framework, the plaintiff must first make out a *prima facie* case of racial discrimination[.]" Rogers v. Henry Ford Health Sys., 897 F.3d 763, 772 (6th Cir. 2018). "Then, 'the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision.'" Id. (quoting Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009)). "If the employer does so, 'the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual.'" Upshaw, 576 F.3d at 584.

In order "[t]o establish a *prima facie* case of discrimination under Title VII, [Shorter] must show that 1) she is a member of a protected class; 2) she was qualified for the job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class." Logan v. Denny's, Inc., 259 F.3d 558, 567 (6th Cir. 2001) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992)). At least arguably, Shorter has made that showing.

Magneti contends that Shorter's *prima facie* case of discrimination fails at the fourth prong – she was not "replaced by a person outside the protected class or treated differently than similarly situated non-minority employees." (Doc. No. 21 at 26). In response, Shorter asserts that "she was treated differently than a number of white employees for similarly situated conduct, including cell phone use," and, indeed, "Roberts created a truly hostile work environment for black employees and

refused to address their valid concerns and issues when raised." (Doc. No. 34 at 10-11).

The problems with Shorter's arguments are many. For one, most of what she testified to in her deposition was clearly based on hearsay and speculation, but "rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law." Mitchell, 964 F.2d at 585; accord, Neff v. City of E. Lansing, 724 F. App'x 448, 452 (6th Cir. 2018). For another, Shorter does not even plead a claim for a hostile work environment, let alone establish a *prima face* claim of such an environment, which requires (among other things) "that the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment," Gallagher v. C. H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir. 2009).

Still another problem is that the Court can only assume from the record before it that the white employees who used their cell phone or walked away from the line, *etc.* were, in fact "similar in all of the relevant aspects," Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). This is even more problematic because Shorter does not claim to have engaged in such conduct or was subjected to discipline on this basis when white employees were not. The Court could go on. However, because the burden of establishing a *prima facie* case of discrimination "is not onerous, but one easily met," Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000), the Court proceeds to Magneti's assertion of a non-discriminatory reason for its action, and the issue of pretext.

For purposes of this decision, the Court assumes that Shorter was discharged and that she did

11

not resign.[7]  Keeping in mind that the articulation of a legitimate non-discriminatory reason "is merely a burden of production, not of persuasion, and it does not involve a credibility assessment," Upshaw, Magneti has met its burden.  By her own account, Shorter was involved in two incidents on the morning of January 10, 2016, whether they were her fault or not.  In an effort to de-escalate the situation, she was asked by Roberts to move to the Supermarket and refused.  Not only that, she demanded that she speak with Dimitrov and, when unable to reach him, called the police to the scene.  This suggests insubordination, which is a legitimate reason for termination.  See Russell v. Univ. of Toledo, 537 F.3d 596, 604 (6th Cir. 2008) (stating that failure to follow instructions and directions constitute legitimate reason for discharge); Arnold v. Marous Bros. Const., 211 F. App'x 377, 381 (6th Cir. 2006) ("This court [the Sixth Circuit] has confirmed that insubordination can constitute legitimate reasons for termination.); EEOC v. St. Joseph Paper Co., 557 F. Supp. 435, 439 (W.D. Tenn. 1983) ("Failure to follow instructions and insubordination are legitimate, non-discriminatory reasons for discharging an employee.").

Because Magneti has offered a nondiscriminatory reason for Shorter's termination, the burden shifts back to her to show that the stated reason is pretextual.  "At this stage, [Shorter] has the burden to produce 'sufficient evidence from which a jury could reasonably reject [Magneti's] explanation of why it fired her.'" Blizzard v. Marion Tech. Coll., 698 F.3d 275, 285 (6th Cir. 2012)

---

[7] Actually, the Court could just as easily conclude that Shorter resigned because, in her declaration, Rosa avers that Magneti's "policy is that any employee who fails to show up to [sic] three consecutive days of work without notifying the Company is deemed to have voluntarily resigned, (Rosa Decl. ¶ 6), and Shorter has not shown otherwise.  Instead, in her brief, she notes the absence of that particular policy language in Rosa's submission, and points to the seemingly unrelated policy language concerning corrective actions and the assessment of disciplinary points.  Furthermore, in her deposition, Shorter indicated that she understood there to be a "no call, no show" policy but she thought the period was two days, not three.  (Shorter Dep. at 146).

12

(quoting Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir.2009)). "She can accomplish this by proving '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her discharge], or (3) that they were insufficient to motivate discharge.'" Id. (quoting Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir.2012)). "Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against h[er].'" Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 545 (6th Cir. 2008) (quoting Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir.2003)).

Which of the three basis Shorter is relying upon to show pretext is unclear from her filings. It appears to be her position that she was within her rights and it was entirely reasonable for her to (1) refuse the order to go to the Supermarket because she thought it was a demotion; and (2) call the cops because Vincent had threatened to "bring up her boys" and "blow up" the plant. She insists her "behavior and reactions on that day were *subjectively* valid and reasonable," and that she "*subjectively* believed" a move to the supermarket "to be a punishment and demotion." (Doc No. 35 at 5, 14, 16, 17) (emphasis added).

"Pretext, however, cannot be shown by attacking the decision itself." Hein v. All Am. Plywood Co., 232 F.3d 482, 490 (6th Cir. 2000) (citing Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 898 (6th Cir.1997). In other words, "a plaintiff's subjective interpretations or feelings are insufficient to establish pretext." Rosenthal v. Faygo Beverages, Inc., 701 F. App'x 472, 480 (6th Cir. 2017); see also, Holobaugh v. State of Tenn., 25 F.3d 1048 (6th Cir. 1994) (stating that a "plaintiff's bald denial of wrongdoing [i]s insufficient evidence to establish pretext").

Regardless, Shorter testified that she was never involved in, or witnessed, physical violence

13

at Magneti, and Vincent's alleged comments about bringing "her boys" to the plant occurred prior to January 10, 2016. (Shorter Dep. a 69, 107). It was only after she was in trouble that she found it "valid and reasonable" to call the police. Furthermore, Shorter concedes that, were she moved to the Supermarket, she would work the same hours and receive the same pay, (id. at 83), and she does not even attempt to show that the transfer was otherwise "intolerable." See Mys v. Michigan Dep't of State Police, 886 F.3d 591, 601 (6th Cir. 2018) (citation omitted) (noting "that an employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability"); Deleon v. Kalamazoo Cty. Rd. Comm'n, 739 F.3d 914, 919 (6th Cir. 2014) (same).

Elsewhere in her reply brief, Shorter points to a declaration from William Bryant, presumably in an effort to show that black employees were disciplined more harshly than white employees. In his declaration, Bryant, a former truck driver at Magneti, states that, after unloading a semi-trailer, he accidentally drove away (approximately 200 yards) with his foreman locked in the back of the truck. Bryant claims that he was sent home and told not to worry about it, but was then fired, even though he offered to take a drug test. He claims this was in contrast to the treatment received by "Mike," a white employee, who allegedly backed his tow motor into a gas line, which required the plant to close for two hours, while emergency personnel came to the plant and made sure there was no gas leak. Even so, "Mike" was allowed to maintain his employment, after he passed a drug screen.

Assuming what Bryant says can be reduced to admissible evidence as required by Fed. R. Civ. P. 56(c)(4) – particularly as it relates to "Mike" and the tow motor incident – the Court is still faced with Shorter's total failure to show that she, Bryant, and/or "Mike" were similarly situated.

14

Case 1:18-cv-00090  Document 39  Filed 04/27/20  Page 14 of 16 PageID #: 938

The Sixth Circuit has repeatedly "held that to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Ercegovich, 154 F.3d at 352 (quoting Mitchell, 964 F.2dd at 863)). Even considering that the "same supervisor" does not necessarily require that the employee's have the same direct supervisor so long as the "ultimate decision maker" is the same, see, McMillan v. Castro, 405 F.3d 405, 414 (6th Cir. 2005), the Court has no way of knowing who was involved in the decision to terminate Bryant's employment, or who was involved in making the decision regarding "Mike."

Shorter's failure to identify the respective decisionmakers also raises the specter of questionable "me too" evidence, involving the treatment of different employees by different supervisors for different issues. See, Schrand v. Fed. Pac. Elec. Co., 851 F.2d 152, 156 (6th Cir. 1988) (noting that "met too" evidence "tend[s] to confuse the issue by focusing the jury's attention on two unrelated events"). This, in turn, raises a host of issues unaddressed by Shorter's filings, "such as temporal and geographical proximity, whether the various decisionmakers knew of the other decisions, whether the employees were similarly situated in relevant respects, or the nature of each employee's allegations of [discrimination]." Griffin v. Finkbeiner, 689 F.3d 584 (6th Cir. 2012).

Ultimately, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" Chen, 580 F.3d at 401 n.4. This inquiry

> requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. . . . [A]t bottom the question is always whether the employer made up its stated reason to conceal

15

intentional discrimination. . . . At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.

Id. The Court finds that Shorter has not produced such evidence, even assuming she established a *prima facie* case.

## IV. Conclusion

On the basis of the foregoing, Magneti's Motion for Summary Judgment (Doc. No. 26) will be granted and Shorter's Complaint will be dismissed.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE